William A. Green and Margaret E. Green [1] v. Commissioner. Green v. Commissioner
Docket Nos. 90214, 90215.
United States Tax Court
T.C. Memo 1963-248; 1963 Tax Ct. Memo LEXIS 100; 22 T.C.M. (CCH) 1241; T.C.M. (RIA) 63248; September 11, 1963
Leslie E. Howell and James M. Secrest, for the petitioners. Howard K. Schwartz, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies against the petitioners *101 in income taxes and additions to tax, as follows: William A. Green and Margaret E. Green, Docket No. 90214 Addition to Tax
Sec. 6654, 1954
Year
Deficiency
I.R.C.
1953
$23,405.84
1954
8,985.40
1955
9,519.21
$ 5.09
1956
10,003.94
1957
11,397.67
43.01
Indiana Tire and Rubber Co., Inc. Docket No. 90215 Year
Deficiency
1956
$1,251.25
1957
726.61 The principal issue for decision is whether the petitioner, William A. Green, received taxable income during the years 1953 through 1957 in the form of constructive dividends by reason of an acquisition by the Indiana Tire and Rubber Co., Inc., of shares of its own stock from E. M. Campbell, its majority stockholder. A subsidiary and related question, which the parties agree will be resolved by our decision on the primary issue, is whether the petitioner corporation was entitled to deduct interest paid in 1956 and 1957 to E. M. Campbell pursuant to an agreement to purchase his shares of stock. Other adjustments contained in the statutory notice of deficiency issued to William A. and Margaret E. Green either were not raised in their petition or were conceded by them at the trial. *102 Findings of Fact Some of the facts were stipulated by the parties and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. William A. and Margaret E. Green are husband and wife presently residing at 6401 Avalon Lane, Indianapolis, Indiana. They filed their joint income tax returns for the taxable years 1953 through 1956 with the district director of internal revenue at Cleveland, Ohio, and their joint return for the taxable year 1957 with the district director at Indianapolis. The Indiana Tire and Rubber Co., Inc. (hereinafter called the corporation), whose present address is 425 W. South Street, Indianapolis, Indiana, filed its corporation income tax returns for the taxable year 1953 through 1957 with the district director of internal revenue at Indianapolis. Prior to January 27, 1953, the 1,000 outstanding shares of common stock in the corporation were held as follows: E. M. Campbell
631
W. A. Green
369
From about 1942 until January 27, 1953, E. M. Campbell was responsible for the management of the corporation. After 1951 poor health plagued Campbell and he began to lose interest in managing corporate *103 affairs. Consequently, in early 1952 he informed William A. Green (hereinafter sometimes referred to as petitioner) that he wanted to retire from the business and desired to sell his stock in the corporation. Petitioner had reason to believe that Campbell had discussed a possible sale of his stock with other persons. Being very much concerned about the preservation of the corporate business and the improvement of its management, as well as safeguarding his own investment as a minority stockholder, the petitioner began later in 1952 to negotiate with Campbell to purchase his shares of stock. His primary intention from the beginning was to acquire such stock for the corporation and not for himself. At that time the petitioner knew that the surplus of the corporation, which was approximately $88,453.40, was insufficient to enable the corporation to purchase Campbell's stock outright. [2]
After various offers and counteroffers were discussed by Green and *104 Campbell, they finally entered into an agreement on January 27, 1953, entitled "Stockholder Contract to Sell Stock and Escrow Agreement for Security." It read, in pertinent part, as follows: 1. That the Seller [Campbell] hereby agrees to sell and the Purchaser [Green] to buy the Six Hundred Thirty-one (631) shares of the common stock of the Corporation now owned by the Seller, and now represented by Certificates numbered Thirty-one (31) and Thirty-two (32) for Eighty-two (82) shares and Five Hundred Forty-nine (549) shares, respectively, for the sum of Two Hundred Thousand Dollars ($200,000.00), which consideration shall be paid by the Purchaser to the Seller, as follows: (a) The sum of Twenty-five Thousand Dollars ($25,000.00) to be paid simultaneously with the execution of this agreement and the delivery of the said stock by the Seller to the Escrow Agent, as hereinafter provided. (b) The balance of One Hundred Seventy-five Thousand Dollars ($175,000.00) to be paid in equal annual payments of Seventeen Thousand Five Hundred Dollars ($17,500.00) for a period of 10 years from the date of this agreement, the first payment to be made on or before the 1st day of February, 1954. *105 (c) The unpaid balance owing to the Seller by the Purchaser shall bear interest at the rate of two and one-half per cent (2 1/2%) per annum computed over a period of 10 years, and shall be payable in ten equal installments. The first installment in the amount of Two Thousand Four Hundred Six and 25/100ths Dollars ($2,406.25) shall be payable on or before the 1st day of February, 1954, and an installment in a like amount payable on or before the 1st day of February each year thereafter until the tenth installment is paid and simultaneously with the payment upon principal as called for hereinabove. In the event the principal is paid in full before the 1st day of February, 1962, the Purchaser shall then be entitled to interest credit for the unexpired time on the following basis. If final payment is made on or before: February 1, 1962, a total credit of
$ 437.50
February 1, 1961, a total credit of
$1312.50
February 1, 1960, a total credit of
$2624.00
February 1, 1959, a total credit of
$4374.00
February 1, 1958, a total credit of
$6562.50 It being the intention to allow interest credit for any unexpired time on the basis of two and one-half per cent (2 1/2%) *106 per annum, payable annually. (d) The Purchaser shall have the privilege of making additional payments upon principal without penalty. Such prepayments, however, shall not relieve the Purchaser from making the regular payments called for by this agreement until the balance is fully paid. 2. The Seller will simultaneously with the execution of this agreement endorse and deliver up to The Indiana Trust Company, of Indianapolis, Indiana, as Escrow Agent and hereinafter referred to as such, the said Six Hundred Thirty-one (631) shares of the corporation owned by him, which stock shall be held by the Escrow Agent upon the following terms and conditions. (a) The Escrow Agent shall hold said stock and deliver only to the Purchaser or his assigns, upon the payment of all of the consideration and interest called for by this agreement to the Seller, when evidence satisfactory to the Escrow Agent is submitted by the Seller that he has received in full such consideration, and in default of such showing by the Seller any other evidence satisfactory to the Escrow Agent that such payment in full has been made shall be sufficient for the purposes of this agreement. (b) That upon payment as *107 called for hereunder in full with interest as provided for in paragraph (a) immediately preceding, the Escrow Agent shall then endorse said stock as agent for the Seller to the Purchaser or his assigns, as the case may be, which endorsement shall be placed thereon by the Escrow Agent as agent for the Seller hereunder. (c) The Purchaser shall have a right to sell or transfer all or any of the shares deposited under this escrow agreement by an assignment acknowledged before a Notary Public, which assignment or assignments when deposited with the Escrow Agent shall entitle the assignees to appear as owners under the said endorsement of said stock deposited to the extent of the number of shares sold by the Purchaser under said assignment. Such assignees shall be obligated in the same manner as the Purchaser hereunder to make all of said payments to the Seller as said amounts of purchase price are agreed upon between the Purchaser and his assign or assigns as the case may be, the Seller crediting said payments as they are made upon the balance owing under this contract of sale. (d) From the date said stock is deposited with the Escrow Agent, all of the voting rights of said stock shall *108 vest and be exercised by the Purchaser or his assign or assigns, as the case may be, to the extent that the Purchaser or his assigns shall be able to exercise full control over the business affairs of the Corporation and so as to permit him or his assigns to exercise exclusive and effective management of the Corporation without interference, for so long as the Purchaser performs the promises and covenants imposed by this agreement upon him. (e) In the event of any default in the payments called for by this agreement by the Purchaser, which default shall continue for a period of 60 days without the payment called for by this agreement being made upon the date specified, and upon a showing satisfactory to the Escrow Agent by the Seller that such default has occurred and has continued for a period of 60 days, then and in that event all rights of the Purchaser or his assigns shall terminate forthwith. Any payments made under and pursuant to this agreement in the event of such default shall be deemed by the parties to be of the nature of liquidated damages and not a penalty, and shall be retained by the Seller as full compensation for damages which he is deemed to have incurred by virtue *109 of the default. The Escrow Agent shall upon such contingency endorse said stock to the Seller and return the same to him as his own property, fee of this escrow agreement and of any claim by the Purchaser or his assigns, provided, however, that before said redelivery to the Seller is effected by the Escrow Agent, the Corporation shall at its principal place of business by registered letter be notified of such default by the Escrow Agent, and in the event the said Corporation shall within 60 days thereafter pay the entire balance then owing the Seller with interest as provided for in this agreement, then and in that event the Escrow Agent shall endorse said stock to the Corporation as Purchaser and free of any claim of the Seller, Purchaser or his assigns, other than such agreements as may then exist between the Corporation and the Purchaser and his assigns, which agreements shall be of no interest nor in any way binding upon the Seller or Escrow Agent under this agreement and neither the Escrow Agent nor the Seller shall have any obligation whatsoever to look to, nor enforce any such agreements if they should exist. 3. In the event dividends shall be declared by the Corporation entitling *110 the holder of any such stock to receive such dividends, then and in that event the Corporation shall hold such dividends earned by the stock escrowed hereunder as trustee for the Purchaser and agent for the Seller or his assigns, and without further authority nor authorization shall make payments of such dividends direct to the Seller, the amount of said dividends being credited upon the unpaid balance called for by this agreement, and the Corporation shall continue to make such dividend payments to the Seller when they are declared until said stock is by this agreement released to the Purchaser or his assigns by the Escrow Agent. 4. The Purchaser or his assign or assigns shall upon request provide for the information of the Seller a duly authenticated or certified copy of the balance sheet and profit and loss statement of said Corporation, which instrument shall be prepared in accordance with the accepted accounting practices, and in the form and in the customary manner as is now provided by the said Corporation, for information of its officers at the time of the execution of this agreement, which information shall be provided to the Purchaser at the same time that such information *111 is provided the company upon annual audit by its accountants. Said information however, shall be considered by the Parties as confidential and for the information only of the Seller. 5. Since the consideration for this agreement is based upon assets and liabilities of the Corporation as they are now disclosed upon its books and records, the Seller and Purchaser being the sole stockholders of the Corporation existing at the time of the agreement hereby agree and covenant in proportion to their stock ownership existing at the time of this agreement to indemnify the Corporation from any liabilities, whether resulting from tax assessments or otherwise, which liabilities accrued and fully matured prior to this agreement, but which are brought to the attention of the purchaser and Seller subsequent to this agreement, and which liabilities are ultimately legal liabilities and lawful charges against the Corporation and which are ultimately liquidated in amount, the Purchaser or Seller or both reserving the right at their own expense to resist any claims asserted, resulting in said liabilities by legal action or otherwise and in the name of the Corporation. 6. The duties of the Escrow Agent *112 hereunder shall be purely ministerial and shall be limited to the observance of the expressed provisions of this Agreement. No implied covenant, duty or obligation on its part shall be read into this Agreement. The Escrow Agent is hereby empowered to act and shall not incur any liability whatsoever for acting upon any instrament, receipt, letter, certificate, notice, demand, request, statement or other paper or document purporting or believed by it to be genuine and purporting or believed by it to satisfy the requirements of this Agreement. The Escrow Agent shall be entitled to rely upon an opinion or certificate of its counsel with respect to any legal opinion, matter or problem in connection with this Agreement. The Escrow Agent shall be fully protected in any action or omission to act if made in good faith hereunder and shall not be responsible for any action or omission to act in accordance with the advice of its counsel. The Escrow Agent shall be entitled to reimbursement for any and all cost, expense and attorney's fees occasioned to it by yeason [reason] of this Agreement and to reasonable compensation for its services, to be paid by purchaser. In the event that the Escrow *113 Agent shall merge or consolidate with any other banking institution, the rights, powers and duties of the Escrow Agent hereunder shall be transferred to the successor institution. 7. This agreement is deemed by the Purchaser and Seller, as present stockholders, officers and directors of the Corporation to be for the benefit of the Corporation as a Third Party beneficiary hereunder. 8. This contract shall be binding upon the heirs, executors, administrators, personal representatives, successors in interest or assigns of the Parties hereto, as the case may be, and its benefits, unless otherwise designated hereunder, shall inure to the heirs, executors, administrators, personal representatives, successors in interest or assigns of the Parties hereto, as the case may be. * * *
APPROVAL The foregoing contract has been considered and its provisions approved by the INDIANA TIRE & RUBBER COMPANY, INC., the designated Third Party beneficiary to said contract, and in the event the said stock of the Corporation is deposited with an Escrow Agent, as provided by said agreement, the said Corporation promises and covenants to be bound by all provisions of the said contract, the said *114 contract being fully considered by the officers and board of directors of said Corporation and the execution of the said agreement by its officers being fully authorized. No promissory notes were executed by the petitioner or the corporation, payable to E. M. Campbell, in regard to the agreement set out above. Petitioner and Campbell had no intention of creating a personal obligation on petitioner's part when they entered into the agreement. Nor does the agreement contain any provision giving rise to a personal obligation. Harry L. Gause, the seller's attorney who drafted the agreement, purposely omitted any such provision. The shares of stock sold by Campbell were pledged as the sole security for the performance of the agreement. Such shares were endorsed in blank and deposited by him with the Escrow Agent, Indiana National Bank, at the time the agreement was executed. Then, on March 31, 1953, the Board of Directors of the corporation adopted the following resolution with respect to the agreement between Campbell and Green. The resolution reads as follows: RESOLVED, that the Indiana Tire and Rubber Company, Inc. accept the assignment and transfer from W. A. Green of a certain *115 contract for the purchase of 631 shares of Corporation stock from Mr. E. M. Campbell dated January 27, 1953, and BE IT FURTHER RESOLVED, that The Indiana Tire and Rubber Company, Inc. upon the acceptance of the aforementioned contract shall assume the obligation of Mr. and Mrs. W. A. Green of $25,000.00 to the Indiana National Bank of Indianapolis, Indiana which obligation was created for the purpose of making a down payment on said contract for stock, and further that the Indiana Tire and Rubber Company, Inc. will accept the assignment and transfer of said contract for the purpose only of acquiring said 631 shares of stock as Treasury stock to be resold and under no circumstances is said stock to be retired and cancelled. And, on the same day, a document entitled "Assignment" was signed by petitioner. It provided: For One Dollar ($1.00) and other valuable consideration I, William A. Green, hereby assign and transfer to Indiana Tire & Rubber Company, Inc. all of my right, title and interest in and to a certain Stockholder Contract to Sell Stock and Escrow Agreement for Security entered into on January 27, 1953, by and between E. M. Campbell and the assignor, William A. Green, *116 said contract being attached hereto. Petitioner did not exercise control over Campbell's shares of stock. Title to the shares did not pass to petitioner. Although he was given the right to vote the stock, such right was immediately passed on to the corporation upon the assignment of petitioner's interest in the agreement. Petitioner did not actively participate in the management of the corporation during the years in issue. He was occupied in 1953 and 1954 as an executive with the B. F. Goodrich Company and later as an independent manufacturers' representative for automotive products. The arrangements made by the petitioner for the purchase of Campbell's shares enabled the corporation to acquire the stock over a period of years without impairing its capital structure. Pursuant to the terms of the agreement, the corporation made the following payments to Campbell: Date
Principal
Interest
Total
12-17-53
$17,500.00
$2,406.25
$19,906.25
12-22-54
17,500.00
2,406.25
19,906.25
12-22-55
17,500.00
2,406.25
19,906.25
12-11-56
17,500.00
2,406.25
19,906.25
12- 2-57
17,500.00
2,406.25
19,906.25
The stock so acquired by the corporation was redeemed *117 as treasury stock for resale and carried as such on the corporate records. While attempts were made by the corporation to resell the stock, none has yet been resold. The management of the corporation substantially improved under G. A. Geer, who was brought in by petitioner to succeed the ailing Campbell as president. Geer had previously served as the petitioner's assistant at the B. F. Goodrich Company. During the years in issue the surplus of the corporation increased as follows: 1952
$ 88,453.40
1953
96,525.64
1954
106,871.58
1955
124,380.48
1956
145,902.92
1957
158,163.52
In the statutory notice of deficiency mailed on October 19, 1960, to the Greens, the respondent gave the following explanation of his adjustments: It is determined that you received a distribution essentially equivalent to a dividend in the amounts of $44,906.25, $19,906.25, $19,906.25, $19,906.25 and $19,906.25 for the years 1953, 1954, 1955, 1956 and 1957, respectively, in accordance with section 115(g) and 302(b) of the Internal Revenue Codes of 1939 and 1954, respectively, and accordingly, such amounts are being included in gross income. Distributions
Taxable Year Ended
12-31-53
12-31-54
12-31-55
12-31-56
12-31-57
Down payment on stock
$25,000.00
(Equity)
Installment paid on
17,500.00
$17,500.00
$17,500.00
$17,500.00
$17,500.00
stock
Interest paid on each
2,406.25
2,406.25
2,406.25
2,406.25
2,406.25
installment
Total
$44,906.25
$19,906.25
$19,906.25
$19,906.25
$19,906.25
*118 In the statutory notice of deficiency mailed on October 19, 1960, to the corporation, the respondent gave the following explanation of his adjustments: It is determined that the amounts of $2,406.25 claimed as interest on your income tax returns for the years 1956 and 1957 were paid on indebtedness of the sole stockholder and would not qualify as interest deductions in accordance with section 163 or any other section of the internal Revenue Code of 1954, and, accordingly, such amounts are being disallowed. Ultimate Findings 1. The petitioner, William A. Green, was acting on behalf of the corporation in negotiating and arranging for the purchase of E. M. Campbell's shares of stock by the corporation. 2. The petitioner was not relieved of a pre-existing indebtedness. 3. The corporation was obligated and did purchase the shares of stock owned by Campbell. 4. The corporation paid interest on its indebtedness to Campbell during the years 1956 and 1957. Opinion Faced with the ignis fatuus of several seemingly conflicting decisions as to whether the use of corporate funds to "buy out" a stockholder results in a constructive dividend to the continuing stockholders, we are *119 asked to decide on these facts whether this petitioner received a distribution essentially equivalent to a dividend under the provisions of section 115(g)(1), Internal Revenue Code of 1939, and section 302, Internal Revenue Code of 1954.[3] Admittedly, there is an exceedingly thin line between the cases cited by both parties. Petitioners rely principally upon Fox v. Harrison, 145 F. 2d 521 (C.A. 7, 1944); John A. Decker, 32 T.C. 326 (1959), affd. 286 F. 2d 427 (C.A. 6, 1961); Erickson v. United States, 189 F. Supp. 521 (D.C.S.D. Ill. 1960); Niederkrome v. Commissioner, 266 F. 2d 238 (C.A. 9, 1958), certiorari denied 359 U.S. 945; Stout v. Commissioner, 273 F. 2d 345 (C.A. 4, 1959), reversing a Memorandum Opinion of this Court; and Milton F. Priester, 38 T.C. 316 (1962). Respondent argues that the instant case is controlled by Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Louis H. Zipp, 28 T.C. 314 (1957), affd. 259 F. 2d 119 (C.A. 6, 1958); Schalk Chemical Company, 32 T.C. 879 (1959), affd. 304 F. 2d. 48 *120 (C.A. 9, 1962); and Robert Deutsch, 38 T.C. 118 (1962). While not entirely free from doubt, the present case is, in our judgment, on the same side of the line as the cases cited by the petitioners, and not on the other side occupied by respondent's authorities. The problem in each instance must be determined from all the facts and circumstances, and we think it would serve no useful purpose to embark upon a detailed discussion and analysis of the many cases cited. Suffice it to say that, after careful consideration of all the testimony offered by petitioners and the documentary evidence of record, we are satisfied that in reality William Green was acting as a conduit for the corporation which we view as the real purchaser of the stock. In Fox v. Harrison, supra, [4] the facts were even less favorable to the taxpayer than those here involved because the taxpayer obtained control of the shares of stock and actually incurred personal liability for the purchase price. In this case the petitioner did not obtain control of the stock. It was given to the Escrow Agent, where it remained until the full purchase price was paid by the corporation. This petitioner did *121 not incur any personal liability. Nor did he receive any financial or economic benefit other than an increase in his percentage of stock ownership. Clearly when a corporation obligates itself to purchase shares of stock, which it has done here, the courts have held that there was no constructive dividend to the other stockholders. See S. K. Ames, Inc., 46 B.T.A. 1020 (1942); and Niederkrome v. Commissioner, supra.The argument that increased stock ownership is a taxable benefit to the remaining stockholder is superficial, for it overlooks the fact that the corporation's worth is decreased by the purchase price and that the increased ownership is in a corporation of lesser value. J. S. Hatcher, 18 B.T.A. 632 (1930); and Milton F. Priester, supra.In Priester we adopted the principles enunciated by the Court of Appeals in Niederkrome and, consequently, we will follow them here. *122 Strangely enough, it seems to us that the respondent is arguing form over substance. Naturally the facts are crucial when such an issue is raised. But, viewing the whole record, the evidence fairly shows in its entirety that Green was acting on behalf of the corporation in handling the negotiations and arrangements which led to the ultimate acquisition by the corporation of Campbell's stock. The petitioner did not act solely to protect his own interests, as respondent asserts. He was equally motivated by his concern for the corporation's future. The two purposes, individual and corporate, were inextricably entwined. Accordingly, we hold that the petitioners did not receive distributions essentially equivalent to dividends during the years in controversy. Having determined that the corporation redeemed its own stock from E. M. Campbell under the agreement of January 27, 1953, it follows that the corporation was entitled to deduct interest paid pursuant thereto in the taxable years 1956 and 1957. To reflect concessions made by the petitioners on other issues, Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith for trial, briefing, and opinion is the proceeding of Indiana Tire and Rubber Co., Inc., Docket No. 90215.↩
2. Under Indiana law a corporation cannot purchase its own capital stock if its capital is impaired thereby. See Sec. 25-202, Ind. Stat. Ann. The capital of the corporation was $100,000. Campbell was asking $200,000 for his stock.↩
3. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (g) Redemption of Stock. - (1) In General. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule. - If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges. - (1) Redemptions Not Equivalent to Dividends. - Subsection (2) shall apply if the redemption is not essentially equivalent to a dividend. ↩
4. The Court of Appeals said at p. 522: * * * Appellant's theory is apparently predicated upon the mere form of the transaction, without giving consideration to the substance. In reality, the involved stock was purchased by the corporation from Cross. That the purchase was not made directly from him was due to the inability of the corporation readily to finance such purchase. Appellee merely supplied the security by which the finances were obtained. The very checks which he received for the stock when it was turned over to the corporation were used in payment of the loan which he had obtained from the bank. He realized no gain or profit on the transaction. His relation to the transaction is very aptly described by the District Court: "* * * that Fox was acquiring said stock on behalf of the corporation and as a temporary expedient, and that when the corporation should accumulate a sufficient surplus and should have available funds, it would take the stock off of Fox's hands. He had no desire or purpose to make a permanent personal investment in the Cross stock."↩