**AMP INCORPORATED AND CONSOLIDATED SUBSIDIARIES, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 94–248T.**

United States Court of Federal Claims.

Jan. 15, 1998.

Robert James Cunningham, Baker & McKenzie, Chicago, IL, for AMP.

G. Robson Stewart, U.S. Dept. of Justice, Tax Division, Claims Court Section, Washington, DC, for U.S.

#### Order[1]

WEINSTEIN, Judge.

The parties have cross-moved for summary judgment. Plaintiff's motion is denied, and defendant's cross-motion is granted.

Plaintiff AMP Inc. brought this action to recover claimed overpayments of federal corporate income taxes for 1981 and 1982. The overpayments allegedly are for insufficient claimed foreign tax credits, under Internal Revenue Code[2] sections 901 and 902, with respect to the foreign tax paid by its wholly-owned Brazilian subsidiary, AMP do Brasil Conectores Electricos E Eletronicos Limitada ("AMP Brasil").

The amounts of the foreign tax credits originally claimed by plaintiff were determined based on the accrued (estimated) tax liability, established at the end of AMP Brasil's Brazilian tax years ("BTY") 1981 and 1982. Plaintiff claims, however, that AMP Brasil subsequently was required to pay "additional" foreign tax, in the form of installment payments made in inflation-adjusted cruzeiros.[3]

Plaintiff claims that, because the total number of *cruzeiros* paid in these monthly installments beginning after the end of the tax year totaled more than its estimated tax liability, expressed in *cruzeiros,* at the end of the taxable year (base period), it was entitled to a "redetermination" of its tax credits for its 1981 and 1982 tax years under I.R.C. section 905.[4] The relevant facts are not disputed. See Joint Stipulations of Facts (Stip.).

Before 1979, Brazilian taxes did not take into account the country's rapidly rising inflation, and advance payments were not required prior to filing the return (for those companies, like AMP Brasil, whose base year ended January to September and who were required to file their tax return by January 31.). Only a first installment was due with the return, and the remainder could be paid in eleven equal monthly installments. Stip. 16; Exh. A (Article 19). Taxpayers failing to make tax installment payments were penalized only by an assessment of 30% interest on the outstanding amount owed.

Beginning in 1980, however, Brazilian law[5] provided that tax debts (*e.g.* for late or insuf-

---

1. This order originally was filed on December 30, 1997 and entered on December 31, 1997. It is being reissued for publication with minor revisions not affecting the substance of the decision.

2. Unless otherwise indicated, citations to the Internal Revenue Code of 1954, as amended ("I.R.C." or "Code"), codified at Title 26, United States Code, and to the Treasury Regulations ("Treas. Reg.") found at Title 26, Code of Federal Regulations, are to the provisions in effect during the years at issue.

3. The terms "monthly installment payments," "monthly payments," or "installment payments" are used to refer both to (1) "advance" monthly payments of ¹⁄₁₂th of the estimated total tax liability due between the end of the taxable year ("base

period," Stip. 13) and the filing of the return as well as to (2) monthly payments made after the return date, as permitted by Brazilian law in effect at the relevant time. Advance payments are comparable to the estimated tax payments required to be filed under U.S. tax laws before the end of the taxable year and before the tax return is filed. I.R.C. § 6654.

4. AMP Brasil's 1981 and 1982 taxable years (BTY 1981 and BTY 1982) ended (like its accounting years) on January 2, 1982 and January 2, 1983, respectively. AMP and AMP Brasil both utilized the accrual method of accounting for both tax and financial reporting purposes.

5. Decree No. 1704 of October 23, 1979. Stip. Exh. B.

ficient monthly installment payments) were subject, not only to 30% penalties on the amount not timely paid, Art. 2, Par. 3, and interest, Stip. 19, but also to indexation for inflation ("monetary correction or adjustment"). This monetary adjustment was calculated by multiplying each late payment by the monthly indexed government treasury bond (Obrigacoes Reajustaveis do Tesouro National, or ORTN) rate in the month the payment actually was made and dividing by the value of the ORTN in the month following that in which it should have been paid. Art. 5, ¶ 1. Stips. 19, 20, Exh. B. The ORTN first was established in 1964 to index the value of fixed assets and the value or obligation associated with credit instruments and contracts. Stip. 20, 23. It was updated each month, to reflect inflation.

Decree Law No. 1704 provided that a company (like AMP Brasil) not closing its base period on December 31, and whose prior year's taxes were over 300,000 cruzeiros (down from the Decree Law No. 62 trigger amount of 10 million), had to make monthly installment payments, beginning in the second month after the month of the close of its base period, and continuing until the month in which the tax return was due to be filed. Exh. B, Decree Law No. 1704, Art. 2; Stip. 18. The amount of each such monthly payment was to be one-twelfth of the prior year's tax liability (35% of profits, except for companies with profits exceeding 30 million cruzeiros, like AMP Brasil, which had to pay an additional 5% [on such additional profits] ). Art. 1. The amount of the tax liability was to be adjusted according to the variation in net sales income, if any, between the prior and the current taxable years. Art. 2; Stip. 18. If the tax due pursuant to the income tax return was greater than the sum of the monthly payments made before the return date, the balance of the tax due could be paid in monthly installments (in an amount not

less than the minimum amount required by law, and in a number which, when added to the number of advance payments made, equaled twelve). Stip. 18; Exh. B, Art. 3.

On November 3, 1981, Ordinance No. 76 was decreed. For returns based on *actual* profit and loss whose accounting periods closed between January and September 1981 (as did AMP Brasil's, which closed on January 2, 1981), the filing period was set between February 11 and February 26, 1982. Stip. 21, Exh. D.

Because of continuing, and steadily increasing, inflation[6], Stip. 23, Decree Law No. 1967 was enacted on November 23, 1982. Decree Law No. 1967, which was applicable to the years at issue in this case, required that Brazilian income tax liability be stated in amounts of ORTN. All required advance and installment payments, even though made in cruzeiros, were to be based on the ORTN-to-cruzeiro index at the time of payment.[7] Stip. 23, Exh. E (Decree Law No. 1967 translated by American Chamber of Commerce for Brazil–Sao Paolo). The amount of cruzeiros paid in any month was to be determined by multiplying the number of ORTN due by the ORTN-to-cruzeiro index for that month. *Id.*

That the estimated tax and each payment were to be calculated in ORTN amounts under Decree Law 1967, is clear: "[t]he basis for calculating the tax ... will be converted into amount of [ORTN] by means of dividing the value of actual profit in cruzeiros ... *by the value of one ORTN [in this case] in the month following the last month of the base-period*" (taxable year). Art. 2, I (emphasis added). "The value of the tax *will be stated in number of ORTN*, which is calculated by multiplying the base for calculus *converted into ORTN as in [Art. 2]*, by [the effective Brazilian corporate tax rate]." Art. 3 (emphasis added). Taxpayers were required to pay the tax in twelve monthly installments,

---

6. During the years at issue, the cruzeiro-to-ORTN index, like the cruzeiro-to-dollar rate, had a different (higher) cruzeiro value in each succeeding month, due to continued inflation. *Id.* Between January 1979 and October 1980 the cruzeiro-to-ORTN rate more than doubled. Subsequent increases between 1981 and 1984 occurred at an even faster rate. The rate increased

by 96.9% in 1981, by 100.2% in 1982, and by 159.2% in 1983. Exh. C.

7. Decree Law No. 1967 was applicable beginning with returns due in 1983. Thus, both AMP Brasil's fiscal year 1982 and 1983 returns, due February 1983 and February 1984, respectively, were covered. Stip. 24, 30.

Art. 8, each in the amount of one-twelfth of the ORTN amount of the previous year's tax liability *"stated in number of ORTN."* Art. 10 (emphasis added); Exh. E; Stip. 23, 26.

Taxpayers (such as AMP Brasil), whose base period ended in January, were required to file their tax returns on the last weekday of February and to make eleven advance installment payments prior to the filing of their tax return, beginning in the second month (*i.e.* March) following the close of their base period, with the balance of the tax due to be paid in a final installment due on or before the due date for the filing of the tax return. Art. 8; Stip. 24, 26. Again, Decree 1967 makes it clear that the base calculations are in ORTN: "basis for calcul[ating the tax], the value of the tax, and the value of each [installment payment] will be stated in number of ORTN up to the second decimal place...." *See, id.,* Art. 4; Stip. 28. "The value of the tax and of each [installment payment] in cruzeiros will be determined by multiplying its value, stated in number of ORTN, by the value of one ORTN at the month [the payment is made]." Art. 5.

Although each monthly installment could be *paid* in cruzeiros, the value in cruzeiros was to be determined in ORTN: "by multiplying its value, stated in number of ORTN, by the value of one ORTN at the month in which the payment is fulfilled." *Id.* Given the rapidly rising rate of inflation during the period at issue, it is evident that these installment tax payments, each of which was fixed in a constant ORTN amount, Art. 10, would be paid in *increasing* cruzeiro amounts, that is, the cruzeiro payments, due to the deflating value of a cruzeiro, would have to increase to match the monthly liability in ORTN, which did not fluctuate. (For example, for BTY 1981, each of the eleven payments due, stated in ORTN, was 6,843.22, according to AMP Brasil's 1981 tax return filed 2/28/83, or 6,992.43 according to the parties' Joint Stipulations of Facts. *See* Stip. 35d.)

Decree Law No. 1967 applied to taxpayers with base periods ending before December 31, 1982, (like AMP Brasil for BTY 1981, closing January 2, 1982), and whose returns were thus due in fiscal 1983. However, Article 11 permitted taxpayers (such as AMP Brasil), that had closed their base period before the enactment of the decree in November, to pay their shares (installments) of the tax owed for fiscal year 1983 according to the legislation effective when the base period ended (for AMP Brasil's BTY 1981, in Jan. 1982). Even so, the same article emphasizes that the basis for all calculations is ORTN, stating, (in pertinent part, emphasis added): "In order to determine, within the fiscal year of 1983, the balance due for tax ..., the shares paid within the years of 1982 and 1983 *will be converted into number of ORTN by means of dividing them by the ORTN value in the month in which they were actually paid for* [sic]." Thus, under Brazilian law, the value of installment payments paid before the November 1982 decree was required to be determined, not in inflating cruzeiros, but in inflation-adjusted ORTN. Stip. 33.

Those who, like AMP Brasil, estimated and made their pre-return "advance" monthly installments based on the tax liability originally estimated prior to the enactment of Decree Law No. 1967 (as of the end of February, 1982 in AMP Brasil's case), and who did not calculate the cruzeiro payment amount in ORTN, were also permitted, under a transition rule, to pay the amount remaining unpaid at the time the return was filed, in up to eleven additional equal monthly payments, not subject to penalty or interest, beginning on the month the return was filed and ending in December 1983. Ordinance No. 278, Exh. F, Stip. 34. The amount of tax remaining unpaid, however, was determined based on the entity's year-end tax liability stated in ORTN, and the amount of each remaining payment also had to be calculated in ORTN, (even though each monthly payment was, as a matter of fact, necessarily made in the common currency, cruzeiros). *Id.* Again, the critical point is that the number of cruzeiros due each succeeding month was not one-twelfth of the liability in cruzeiros, but rather one-twelfth of the amount stated in ORTN, according to that month's ORTN-to-cruzeiro index. Thus, ORTN, an inflation-free measure of value, remained constant, while the corresponding cruzeiro amounts actually

(necessarily) used to make the payments increased with the rate of inflation.

### BTY 1981

AMP Brasil made eleven pre-return "advance" installment payments for BTY 1981 (from March 1982 to January 1983), each consisting of one-twelfth of its estimated tax liability for BTY 1981 (the taxable year ended January 2, 1982), based on its taxes in cruzeiros for BTY 1980 (217,748,171 cruzeiros), adjusted for sales. Stip. 35. Its tax return was due and filed at the end of February 1983 (February 28), after Decree Law No. 1967 was enacted. At that time, its taxes were calculated, according to the new law, by applying the Brazilian 30% corporate tax rate (plus 10% on the taxable income exceeding 60,000 ORTN), see Exh. E, Art. 24, to the taxable income of 501,124.83 ORTN at the cruzeiro-to-ORTN rate as of February 1982 (the month following the last month of the base period). This produces a tax liability of 194,449.93 ORTN, which, as of February 1982, equaled 296,858,930 cruzeiros.

Stip. 35.[8] The cruzeiro amounts paid in prior months were credited at their ORTN value each month, totaling 117,533.20 ORTN, leaving 76,916.73 ORTN to be paid. Id.; See n. 8, supra. Relying on the transition rule permitting up to 11 additional post-return payments, AMP Brasil then paid two of the ten post-filing installments (in February and March 1983), and prepaid the remainder in April 1983. Although entitled to seek an additional extension of up to eighteen monthly installments, AMP Brasil elected not to do so. Stip. 33. (Contrary to plaintiff's suggestion, extending the time for these payments would not have produced any benefit, since the amount of each of the payments was required to be set in inflation-adjusted currency, i.e., in ORTN.)

The following table summarizes AMP Brasil's estimated and actual tax liability for BTY 1981, and its payments in cruzeiros, as well as their value in ORTN and dollars according to the index or exchange rate in effect each month.

| Payment date | Amount paid (in cruzeiros) | Index cruzeiros to ORTN | Index cruzeiros to dollars | Amount paid (in inflation-adjusted ORTN) | Amount paid (in inflation-adjusted $s) |
|---|---|---|---|---|---|
| [End of February, 1982—tax liability for BTY 1981 calculated as 296,858,930 cruzeiros, which is equivalent to 194,449.93 ORTN (or $2,105,382.48 @ 141.00 cruz/$, which was the exchange rate on the last business day of February 1982).] | | | | | |
| 03/10/82 | 22,343,577 | 1,602.99 | 140.35 | 13,938.69 | 159,198.98 |
| 04/10/82 | 22,343,577 | 1,683.14 | 147.84 | 13,274.93 | 151,133.50 |
| 05/10/82 | 22,343,577 | 1,775.71 | 155.23 | 12,582.90 | 143,938.52 |
| 06/10/82 | 22,343,577 | 1,873.37 | 163.76 | 11,926.94 | 136,440.99 |
| 07/10/82 | 22,343,577 | 1,976.41 | 175.40 | 11,305.13 | 127,386.41 |
| 08/10/82 | 22,343,577 | 2,094.99 | 182.25 | 10,665.24 | 122,598.50 |
| 09/10/82 | 22,343,577 | 2,241.64 | 185.79 | 9,967.50 | 120,262.54 |
| 10/10/82 | 22,343,577 | 2,398.55 | 206.72 | 9,315.44 | 108,086.19 |
| 11/10/82 | 22,343,577 | 2,566.45 | 220.68 | 8,706.02 | 101,248.76 |
| 12/10/82 | 22,343,577 | 2,733.27 | 236.66 | 8,174.66 | 94,412.14 |
| 01/10/83 | 22,343,577 | 2,910.93 | 248.20 | 7,675.75 | 90,022.47 |
| [2/28/83—Tax return filed; 76,916.73 ORTN remained unpaid. Divided by eleven, this required eleven additional payments of 6,992.43 ORTN each.] | | | | | |
| 02/28/83 | 21,575,771 | 3,085.59 | 379.54 | 6,992.43 | 56,847.16 |
| 03/30/93 | 23,021,316 | 3,292.32 | 404.33 | 6,992.43 | 56,936.95 |
| 04/29/83 | 225,839,196 | 3,588.63 | 452.57 | 62,931.87 | 499,014.95 |

8. These amounts do not reflect a deduction of 7,516.87 ORTN for BTY 1981 and 9,945.21 ORTN for BTY 1982, deductions for "social integration plan(s)", as shown on the tax returns appended to defendant's December 19, 1996 reply brief.

[6/21/83——Amended U.S. tax return for FY 1982 filed.]

| | | |
|---|---|---|
| Total Payments 516,215,430 | 194,449.93 | 1,967,528.06 |

The following table compares the tax liability for BTY 1981 stated in cruzeiros, ORTN, and dollars, with the total amounts actually paid in cruzeiros, ORTN and dollars.

| Currency | Tax Liability for BTY 1981 as of end of February 1982 | Amount actually paid |
|---|---|---|
| Cruzeiros | 296,858,930.00 | 516,215,430.00 |
| ORTN | 194,449.93 | 194,449.93 |
| U.S. Dollars | 2,105,382.48 | 1,967,528.06 |

It is clear from this last table that AMP Brasil did not make "additional" tax payments for BTY 1981 if these are measured in fixed currencies, such as dollars or, as Brazilian law requires, ORTN. (In fact, in dollars, the tax actually paid was *lower* than the accrued tax liability.)

*BTY 1982*

AMP Brasil filed its tax return for the tax year ending January 2, 1983 (BTY 1982), on or about February 28, 1984. Stip. 36. Its tax liability for 1982 (stated as of February 1983), was 251,734.01 ORTN (776,747,944 cruzeiros at the February 1983 index rate). The following table shows the amount owed and paid in ORTN, cruzeiros and dollars for BTY 1982:

| Payment date | Amount paid (in cruzeiros) | Index cruzeiro to ORTN | Amount paid (in ORTN) | Index cruzeiro to dollars | Amount paid (in dollars) |
|---|---|---|---|---|---|
| [Liability as of 2/83 was 251,734.01 ORTN, equaling 776,747,944 cruzeiros as of 2/83 and $ 2,046,550.94 @ 379.54 cruz/$ as of 2/28/83.] | | | | | |
| 03/03/83 | 53,349,279 | 3,292.32 | 16,204.16 | 386.71 | 137,956.81 |
| 04/29/83 | 740,290,695 | 3,588.63 | 206,287.83 | 452.57 | 1,635,748.49 |
| [2/28/84 TY 1983 tax return filed, liability established at 251,734.01 ORTN, of which 29,242.02 remained to be paid.] | | | | | |
| 02/29/84 | 242,284,464 | 8,285.49 | 29,242.02 | 1,154.00 | 209,951.88 |
| Total Payments | 1,035,924,438 | | 251,734.01 | | 1,983,657.18 |

The following table compares the tax liability for BTY 1982 stated in cruzeiros, ORTN, and dollars, with the total amounts actually paid in cruzeiros, ORTN and dollars.

| Currency | Tax Liability for BTY 1982 as of end of February 1983 | Amount actually paid |
|---|---|---|
| Cruzeiros | 776,747,944.00 | 1,035,924,438.00 |
| ORTN | 251,734.01 | 251,734.01 |
| U.S. Dollars | 2,046,550.94 | 1,983,657.18 |

Again, AMP Brasil claims it paid an "additional" amount of 259,176,444 cruzeiros, *i.e.*, 1,035,924,438 (the number of cruzeiros paid on dates subsequent to February 1983) less 776,747,944 (the cruzeiro amount of the "accrued" tax liability as of February 1983). However, as can be seen from this last table, AMP Brasil did not make "additional" tax payments for BTY 1982 if these are measured either in dollars or, as Brazilian law requires, in ORTN amounts. Again, as with respect to BTY 1981, the dollar value of the tax actually paid was *lower* than the dollar value of the tax accrued.

AMP Brasil distributed dividends to AMP in 1981 and 1982. For TY 1981, AMP Brasil's pre-tax earnings and profits were 776,271,908 cruzeiros, Stip. 39, and it distributed dividends of 411,326,700 cruzeiros to AMP, as follows:

| Payment date | Amount paid (in cruzeiros) | Cruzeiro-to-dollar exchange rate | Amount paid (in dollars) |
|---|---|---|---|
| 02/25/81 | 86,421,500 | 70.44 | 1,226,881 |
| 03/18/81 | 53,577,200 | 74.69 | 717,328 |
| 05/11/81 | 80,000,000 | 82.75 | 966,767 |
| 08/06/81 | 33,740,000 | 96.40 | 350,000 |
| 08/28/81 | 79,153,700 | 100.80 | 785,255 |
| 09/21/81 | 70,846,300 | 104.54 | 677,695 |
| 10/13/81 | 7,588,000 | 108.40 | 70,000 |
| | 411,326,700 | | 4,793,926. |

Stip. 41. In 1982, AMP Brasil's pre-tax earnings and profits were 1,756,208,100 cruzeiros, Stip. 40, and it distributed dividends of 800,000,000 cruzeiros to AMP, as follows:

| Payment date | Amount paid (in cruzeiros) | Cruzeiro-to-dollar exchange rate | Amount paid (in dollars) |
|---|---|---|---|
| 04/01/82 | 300,000,000 | 147.47 | 2,034,312 |
| 09/19/82 | 500,000,000 | 188.96 | 2,646,063 |
| | 800,000,000 | | 4,680,375 |

Stip. 41.

On September 10, 1982, AMP filed its corporate income tax return for its U.S. tax year ending December 31, 1981. Stip. 5. It claimed a foreign tax credit under I.R.C. § 901 for taxes deemed paid under I.R.C. § 902 in connection with the dividends paid by AMP Brasil in 1981, calculated with reference to AMP Brasil's 296,858,930 cruzeiros liability as of January 2, 1982. Stip. 42. On September 15, 1983, AMP filed its corporate income tax return for the year ending December 31, 1982. Stip. 6. It claimed a foreign tax credit for the dividends paid by

AMP Brasil in 1982, based on the 776,747,944 cruzeiro liability amount as of January 2, 1983. Stip. 45.

On or about December 23, 1986, AMP filed amended returns for its 1981 and 1982 taxable years, claiming refunds of $2,191,587 for BTY 1981, $1,463,953 for BTY 1982, allegedly attributable to "additional" cruzeiros AMP Brasil paid to satisfy its tax liability for BTYs 1981 and 1982. Stip. 43, 46. The claims were denied in part.

### Standard of Review

Summary judgment is appropriate when there is no genuine issue as to a fact that is material to establishing the plaintiff's claim, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

### Discussion

■ I.R.C. § 901 allows a tax credit for foreign taxes "paid or accrued during the taxable year to any foreign country." *See* I.R.C. § 901(b)(1). This provision is intended to avoid double taxation. *See, e.g., United States v. Cruz*, 698 F.2d 1148, 1152 n. 2 (11th Cir.1983).

I.R.C. § 902(a) provides, in pertinent part:

[A] domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country ..., which the amount of such dividends ... bears to the amount of [the foreign corporation's after-tax earnings and profits].

The § 901 credits may be taken in the year in which the taxes of the foreign country accrued. 26 U.S.C. § 905(a). However, "[i]f accrued taxes when paid differ from the amounts claimed as credits ... the taxpayer shall notify the Secretary, who shall redeter-

mine the amount of the tax for the year or years affected." § 905(c).

Section 131 of the Revenue Act of 1932 "makes no provision for reducing foreign taxes paid with foreign money to American dollars for the purpose of the credit." *Bon Ami Co. v. Commissioner*, 39 B.T.A. 825, 826, 1939 WL 215 (B.T.A.1939)(referring to the substantially similar predecessor to § 902(a)). However, "[s]ince foreign taxes are paid in foreign currency, such taxes must be converted into United States dollars in order to compute the foreign tax credit." 12 *Mertens Law of Fed. Income Tax* § 45D.05, at 45D–67 to –68 (1996); *see also id.* at § 45D.01, at 45D–1.

For foreign taxes paid on earnings and profits earned before 1987, the credit generally is calculated by converting the foreign currency payment into dollars, using the exchange rate in effect on the date the dividend was declared. Rev. Rul. 91–21, 1991–1 C.B. 112, 113 (citing *Bon Ami Co.*, 39 B.T.A. at 827). *See American Home Prods. Corp. v. United States*, 220 Ct.Cl. 369, 601 F.2d 540, 543 n. 4 (1979).

Because the ORTN-to-dollar rate is fairly constant, *see* Rev. Rul, 91–21, 1991–1 C.B. at 113, and both the foreign tax liability and the amount of payment were determined in ORTN, the court concludes that the value of the tax at the time it was paid must be calculated in ORTN, not cruzeiros. (In any event, whether the dollar value of the foreign tax paid is calculated by multiplying ORTN by the ORTN-to-dollar rate on the dividend date or by multiplying cruzeiros by the cruzeiro-to dollar rate on the payment dates, the result is nearly identical because both figures are inflation adjusted.)

The issue in this case is whether to calculate the foreign tax (1) by looking to the value of AMP Brasil's tax liability in cruzeiros at the time it was set under Brazilian law (February 1982 for BTY 1981 and February 1983 for BTY 1982) and then subtracting this cruzeiro amount from the total number of cruzeiros AMP Brasil paid over the preceding year and treating the difference as an "additional payment" requiring a redetermination of liability, under § 905 (as plaintiff contends), or (2) by comparing its tax liability

in (inflation-adjusted) ORTN (or dollars) at the time the tax liability was set with the sum of the inflation-adjusted values in ORTN (or dollars) of the payments at the time of payment, in which case there is no need for a redetermination, since the amount of ORTN (or dollars) *paid* (in cruzeiros at the index-rate at the time of payment) is equal to the amount of ORTN (and slightly less than the amount of dollars) *owed* (in cruzeiros at the index rate at the time liability is set) (as defendant contends).

■ The regulations applicable to the tax years at issue provide no assistance, *see* Treas. Reg. § 1.902–1(b)(2). However, a later IRS revenue ruling that considered the exact question of the creditability of Brazilian tax payments, concluded, "[f]or purposes of section 902 of the Code, the ORTN tax liability is the foreign income tax." Rev. Rul. 91–21, 1991–1 C.B. at 113. The court defers to this ruling. *See Foil v. Commissioner,* 920 F.2d 1196, 1201 (5th Cir.1990) ("Revenue Rulings are ... 'entitled to respectful consideration,' and are 'to be given weight as expressing the studied view of the agency whose duty it is to carry out the statute.' ") (quoting *Groves v. United States,* 533 F.2d 1376, 1380 (5th Cir.1976), *United States Trust Co. v. IRS,* 803 F.2d 1363, 1370 n. 9 (5th Cir.1986), and *Miami Beach First Nat'l Bank v. United States,* 443 F.2d 475, 478 (5th Cir.1971)). The agency's interpretation of a statute or regulation obviously is entitled to deference even if evinced after the statute or regulation was enacted.

■ Under financial accounting rules, the revenue ruling correctly (in the opinion of the court) uses ORTN to calculate the § 902 foreign tax credit, because this is the "functional currency" for Brazilian tax law and for commercial purposes. An entity's "functional currency" is:

the primary currency of the economic environment in which the entity operates. It is presumed that an entity's functional currency would be the currency of the country in which the entity is located and the currency of the country in which the books of record are maintained. In some instances, however, a foreign entity's functional currency may not be the currency of the

country where the entity is located even though that currency is used in the books of records [sic].

I.R.S. Ann. 81–4 (1981) (citing Financial Accounting Standards Bd., *Foreign Currency Translation, Exposure Draft* ¶ 15 (Aug. 28, 1980)); *cf.* I.R.C. § 985(b)(1) (1986) and regulations thereunder.

Standard commercial practice in Brazil during the years at issue was to use the ORTN to correct for the cruzeiro's declining value. *See, e.g., United States v. Campbell,* 897 F.2d 1317, 1321 (5th Cir.1990) (finding that promissory notes issued in cruzeiros in 1982 did not comport with standard commercial practice in Brazil due to the absence in the notes of a monetary correction factor); *Industria de Fundicao Tupy v. United States,* 936 F.Supp. 1009, 1016 (CIT 1996) (the Department of Commerce, in its review of an anti-dumping order, properly relied on petition's calculations of the products' fair market value which adjusted the actual product prices by the ratio of ORTN indices for April 1983 and November 1984). In fact, it appears that almost all aspects of the Brazilian economy, including income taxes, social security payments, capital markets, leases, expropriations, labor costs, and prevailing accounting practices incorporated, or were regulated by, a system of monetary correction using the ORTN during the years at issue. *See* Antonio Mendes and Luciana R. Galhardo, *Monetary Correction in Brazil: Brazilian Indexing System Can Only Approximate a Stable Economy.* 4 J. Int'l Tax'n 394, 395, 397 (September 1993). Therefore, the court finds that the ORTN was AMP Brasil's functional currency during the periods at issue, and concludes that all of the foreign subsidiary's earnings, dividends, and taxes must be converted to dollars based on the ORTN value of its tax liability and at the time of its dividend payments. *See* I.R.S. Ann. 81–4.

Plaintiff's contention that AMP Brasil paid "additional tax" is based on several implicit but false assumptions: (1) that the foreign tax credit should be determined by translating the tax payments in number of cruzeiros by the spot exchange rate for valuing the distribution, as established in *Bon Ami,* (2) that AMP Brasil "accrued" taxes *in cruzei-*

*ros,* not ORTN, when the tax was first estimated (the month after the close of the taxable year) for purposes of calculating the amount of the required monthly pre-return installment payments, (3) that AMP Brasil's installment payments were to be valued in *cruzeiros* (however inflated), not ORTN, and (4) that its "additional" cruzeiro payment although not based on the difference between the dollar value of the accrued foreign tax and the dollar value of the paid foreign tax, nonetheless is a "redetermination" under § 905(c).

Plaintiff's suggestion that the number of cruzeiros paid, without respect to their ORTN value at the time of payment, should determine the number of dollars eligible for foreign tax credit purposes, simply ignores the cruzeiro's rapid loss of value and the Brazilian tax law's attempt to eliminate its effect in the tax arena. For tax year 1981, plaintiff would treat the devalued cruzeiros that AMP Brasil paid to the Brazilian government in 1982–83 as the equivalent of those it distributed to AMP in 1981; and for tax year 1982, plaintiff would treat the devalued cruzeiros that AMP Brasil paid in 1983–84 as the equivalent of the cruzeiros AMP Brasil distributed to AMP in 1982. Further, plaintiff would calculate the ratio of taxes to after-tax earnings and profits (the "§ 902 ratio" or "Federal tax dividend"), which is the ratio applied to determine which portion of the dividends paid to AMP constitutes foreign taxes "deemed to be paid" by plaintiff, under § 902, in calculating the foreign tax credit, by disregarding this critical difference.[9] Defendant's method of calculating the foreign tax credit, on the other hand, properly produces an effective tax rate that is consistent with AMP Brasil's effective tax rate.

The only difference between plaintiff's and defendant's figures in calculating the § 902 ratio is the so-called "additional tax" plaintiff argues that AMP Brasil paid. *See* Plf. Br. 22–23; Def. Br. 25–27. Specifically, plaintiff alleges that it paid 219,356,500 "additional" cruzeiros for BTY 1981, and 259,176,494 "additional" cruzeiros for BTY 1982. Under plaintiff's argument, AMP Brasil's total "tax pool" must be redetermined as 516,215,430 cruzeiros (296,858,930 plus 219,356,500) rather than 296,858,930 cruzeiros for BTY tax year 1981, and 1,035,924,438 cruzeiros (776,-747,944 plus 259,176,494), rather than 776,-747,944, cruzeiros for BTY 1982. Deducting these larger tax amounts from earnings and profits (E & P), as I.R.C. § 902(a) requires, obviously decreases AMP Brasil's after-tax E & P from 479,412,978 to 260,056,478 cruzeiros for BTY 1981 and from 979,460,156 to 720,-283,662 cruzeiros for BTY 1982.[10]

Plaintiff's figures thus, as § 902(a) requires, add the "additional taxes" to the numerator and subtract the same amount from the denominator. This necessarily, and dramatically, increases the § 902 ratio. According to plaintiff's numbers, the § 902 ratio is approximately 2 (516,215,430 over 260,056,-478) for BTY 1981 and 10/7 or 1.4 (1,035,924,-438 over 720,283,662) for BTY 1982. Defendant's § 902 ratios for these years, on the other hand, are only 5/8 for BTY 1981 and 4/5 for BTY 1982. These are the ratios used on plaintiff's original return, which were based on taxes of 296,858,930 cruzeiros divided by E & P of 479,412,978 cruzeiros for BTY 1981 and 776,747,944 cruzeiros in taxes divided by 979,460,156 cruzeiros in E & P for BTY 1982. Thus, plaintiff's higher § 902 ratios result in foreign tax credits over three

---

9. The deemed paid tax formula stated in § 902 is the foreign income taxes paid multiplied by the ratio of dividends received to accumulated profits less foreign income taxes paid. However, the formula can be stated with equally accurate results as the dividends received multiplied by the ratio of the foreign income taxes paid to accumulated profits less foreign income taxes paid, thus focusing on the relationship between taxes and accumulated profits. *See, e.g.,* Tech. Adv. Mem. 9727002, 1997 WL 366230 (Jul. 3, 1997) ("[despite] 1986 Act amendments to section 902, ... underlying principle of section 902 that the proportionate relationship between a foreign corporation's earnings and taxes must be maintained,

i.e. matched, has not changed."). This order focuses on the latter formulation and uses the term "§ 902 ratio" to refer to the ratio of the foreign income taxes paid to accumulated profits less foreign income taxes paid, because this formulation more clearly illustrates the differences between plaintiff's and defendant's methods of determining whether plaintiff is entitled to a redetermination under § 905(c).

10. AMP Brasil's pre-tax E & P were 776,271,908 cruzeiros for BTY 1981, and 1,756,208,100 cruzeiros for BTY 1982.

times greater than defendant's for dividends with respect to BTY 1981 (2 divided by 5/8, or about 3.2)—and almost two times greater for dividends with respect to BTY 1982 (10/7 divided by 4/5 or about 1.8). This is as expected, since an accounting method that understates the foreign subsidiary's after-tax earnings and profits will overstate the proportion representing the foreign tax credit, as will a method that overstates the foreign tax paid; and plaintiff's method does both.

Moreover, the use of the earlier, and thus higher, foreign exchange rate in effect when a dividend was distributed to AMP would give plaintiff a windfall because it would overstate the dollar value of the tax at the time the dividend was paid. (Had the value in fact been overstated the proper result would be identical, as a redetermination under § 905 would be required, to recalculate the amount actually owed—a redetermination being necessary, not only to protect a taxpayer from undervaluing its payments, but also to protect the government from a taxpayer's overvaluation! See further discussion *infra.*)

The cruzeiro-to-dollar exchange rate when the dividend was declared is not the real issue. The critical factor is the ratio applied to the dividend. (This ratio remains constant even if the cruzeiro-to-dollar rate is used.) That is because the foreign tax credit is based on the proportion of tax liability to E & P. If the proportion is determined as of the month after the close of the taxable year, the date as of which both E & P and tax liability are determined under Brazilian law, see Decree Law No. 1967, Arts. 2 and 3, there is no need to review payment history, because overpayments would not be required by Brazilian tax law, and underpayments do not reduce liability (the accrued amount).

As of February 1982, AMP Brasil's pre-tax E & P (for BTY 1981) was 508,477.27 in ORTN, 776,271,908 in cruzeiros and 5,505,474.52 in dollars, its after-tax E & P was 314,027.34 in ORTN, 479,412,978 in cruzeiros and 3,400,092.04 in dollars, and its tax liability was 194,449.93 in ORTN, 296,858,930 in cruzeiros and 2,105,382.48 in dollars. Whether measured in ORTN, cruzeiros, or dollars, the BTY 1981 § 902 ratio as of that date is

the same, *i.e.,* 0.6192. Similarly, as of February 1983, AMP Brasil's pre-tax E & P was 569,164.44 in ORTN, 1,756,208,100 in cruzeiros and 4,627,201.61 in dollars, its after-tax E & P was 317,430.43 in ORTN, 979,460,156 in cruzeiros and 2,580,650.67 in dollars, while its tax liability as of that date was 251,734.01 ORTN, 776,747,944 cruzeiros, and 2,046,550.94 in dollars. However stated, the BTY 1982 § 902 ratio is 0.7930.

The statutory provision that governs whether a redetermination of a taxpayer's foreign tax credit is required is § 905(c), which provides (in pertinent part):

**(c) Adjustments on payment of accrued taxes.**

If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, . . . , the taxpayer shall notify the Secretary, who shall redetermine the amount of the tax for the year or years affected. The amount of tax due on such redetermination, if any, shall be paid by the taxpayer on notice and demand by the Secretary, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with subchapter B of chapter 66 (sec. 6511 and following). . . .

The first question under § 905 is whether there was in fact any "difference" between the foreign tax "accrued" (and claimed by plaintiff as a credit) and the foreign tax "paid" by AMP Brasil for BTYs 1981 and 1982.

Whether measured in ORTN at the time of accrual and ORTN at the time of each installment payment, or in dollars at each such time, the amount of taxes paid by AMP Brasil is equal to (if measured in ORTN), or less than (if measured in dollars), the amount of taxes accrued.

Plaintiff contends that it is entitled to a redetermination under Treas. Reg. § 1.905–3T(c)(2) (1989), which provides that a redetermination includes "[a] difference between the dollar value of the accrued foreign tax and the dollar value of the foreign tax actually paid attributable to differences in the units of foreign currency paid and the units of foreign currency accrued." Section 1.905–3T(c), which defines the term "foreign tax

determination," applies to the years in question because it is incorporated into Treas. Reg. § 1.905–5T(c), which governs foreign tax redeterminations "with respect to foreign tax deemed paid under § 902 ... with respect to earnings and profits accumulated in taxable years of a foreign corporation beginning prior to January 1, 1987," regardless of when the redeterminations occur. Treas. Reg. § 1.905–5T(a). *See also* T.D. 8210, 1988–2 C.B. 248, 248. However, 1.905–3T(c)(2) does not provide any assistance to plaintiff, since it is applicable only if there is a difference between the dollar value of the taxes accrued and those paid by AMP Brasil. There is no such difference here, if one compares the total taxes "accrued" (estimated) and the total taxes paid for each year in dollars (or ORTN).

Only by comparing payments in devalued cruzeiros to an estimated ("accrued" or "deemed" paid) payment in non-devalued cruzeiros can plaintiff come up with a "difference" under I.R.C. § 905. That is, plaintiff, purportedly in reliance upon *Bon Ami,* contends that the "difference" consists of the additional, devalued cruzeiros, valued, not at the ORTN or dollar rate when paid to the Brazilian government but, rather, at the more favorable dollar exchange rate on the (earlier) date when the dividend was paid. However, the *Bon Ami* rule is not used for determining whether a redetermination is necessary, but rather to decide the amount of the dividend in U.S. dollars. Only the § 902 *ratio* is at issue here, not the exchange rate at the time of the payment to the parent company. The court does not view this as a "difference" under I.R.C. § 905 (or under Brazilian law) because the § 902 formula for amounts "deemed paid" or "paid" upon which plaintiff relies *compares* the two measures, it does not *add* them to one another. That is, if the tax *"deemed paid" (accrued)* equals the tax *actually paid,* no redetermination notice is necessary. The amounts to be compared are calculated under Brazilian tax law. *See Biddle v. Commissioner,* 302 U.S. 573, 578–79, 58 S.Ct. 379, 381–82, 82 L.Ed. 431 (1938)(amount of foreign income tax paid is determined under foreign law).

Plaintiff's other implicit contention that, because the statutory requirement to calculate tax in ORTN was not enacted until November 1982, AMP Brasil's tax payments up until that time were not required to be based on ORTN, but could be made in cruzeiros, is contrary to the plain language of the new Brazilian law, which requires calculation of the total tax due and the amount of each installment payment to be in ORTN. *See* Decree Law No. 1967, Arts. 2, 3.

The parties appear to agree that the *Bon Ami* rule of converting the foreign tax paid into dollars using the exchange rate in effect on the dividend date governs this case. The court reads *Bon Ami* more narrowly. *Bon Ami* merely holds that payments in prior years may be considered and credited only in the taxable year paid. However, when the Commissioner, as here, was "willing" to allow one year's payments to be credited in another taxable year, the exchange rate for the year of credit should apply. Thus, the appropriate year of credit, rather than the appropriate exchange rate, actually was at issue in *Bon Ami.*

The situation in this case is more comparable to that in *American Metal Co. v. Commissioner,* 19 T.C. 879, 880–83, 1953 WL 148 (1953), *aff'd,* 221 F.2d 134, 141–42 (2d Cir. 1955), where the foreign subsidiary paid its taxes in Mexican pesos, paid its dividends and conducted its business mostly in American dollars, and kept its books in an arbitrary unit known as "pesos 2 for 1," whereby dollars were recorded at twice their value and pesos were converted to dollars and then doubled. The IRS argued that, under *Bon Ami,* the tax should be converted to dollars using the exchange rate in effect on the dividend date. The court held, however, that the tax should be calculated by using the rate in effect when the tax was paid. 19 T.C. at 887. The court stated,

[*Bon Ami* ] is not in point. There, the foreign taxpayer kept its books on the basis of the foreign currency so that the foreign tax paid, the accumulated earnings, and the ultimate dividend were *all* in terms of foreign currency and there was no occasion to reduce *any* of them to Unit-

ed States currency until the dividend was paid and the credit computed.

*Id.* at 886–87 (emphasis added).

Unlike here, in *Bon Ami* inflation did not appear to affect the amount of the company's dividends, whether calculated at the time of payment, of tax liability calculation, or of tax payment.

Although defendant argues (and the court agrees) that the additional cruzeiros paid by AMP Brasil in subsequent years due to the rising cruzeiro-to-ORTN index should not be taken into account in computing the § 902 credit, defendant suggests that, to "appropriately tailor[ ] the interpretation of § 902 and the *Bon Ami* rule to take into account the special economic conditions presented by hyperinflation in Brazil," Def. Br. 34, those additional cruzeiros should be deducted from the earnings and profits of the years in which the installments are made. Defendant concedes that this would depart from the general rule that foreign taxes reduce earnings and profits for the year to which the taxes relate, even if they are paid in a different year, *see H.H. Robertson Co. v. Commissioner*, 59 T.C. 53, 78–79, 1972 WL 2523 (1972), *aff'd*, 500 F.2d 1399 (3d. Cir.1974); *Stern Bros. v. Commissioner*, 16 T.C. 295, 323, 1951 WL 86 (1951). (Revenue Ruling 91–21 does not answer the question, for it does not address how to calculate the foreign subsidiary's after-tax earnings and profits.)

The court disagrees with defendant's proposal to allow cruzeiros paid in subsequent years to be deducted from the earnings and profits of those years. First, the general rule accords with the notion that the amount of foreign income tax paid is determined under foreign law, *Biddle*, 302 U.S. at 578–79, 58 S.Ct. at 381–82, because Brazil allows one year's tax liability to be paid in subsequent years.

Furthermore, under I.R.C. § 902(a), the paid foreign tax, a portion of which becomes the foreign tax credit, is the same ("such") paid foreign tax that is deducted from the foreign subsidiary's earnings and profits to determine the correct proportion. *See also* Treas. Reg. § 1.902–1(b)(2) ("such taxes"). Defendant would calculate the first "income ... tax[ ]" by multiplying the foreign subsid-

iary's ORTN-denominated liability by the ORTN-to-cruzeiro index for the month of the dividend, and the second "income ... tax[ ]" by multiplying the foreign subsidiary's ORTN-denominated liability by the ORTN-to-cruzeiro index for the month after the foreign subsidiary's taxable year closed. However, the plain language of I.R.C. § 902(a) forecloses defendant's approach.

### Conclusion

For the reasons stated above, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted.